LIVE OAK LAW OFFICE LLP
Robyn Fass Wang (SBN 194006)
Pilar R. Stillwater (SBN 260467)
1442A Walnut Street #229
Berkeley, California 94709
Telephone: 510.637.9349
rfasswang@liveoaklawoffice.com
pstillwater@liveoaklawoffice.com

Attorneys for Plaintiff
ANTHONY RUBIO

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY RUBIO,<br><br>                Plaintiff,<br><br>        v.<br><br>LAW OFFICES OF LOS ANGELES COUNTY PUBLIC DEFENDER, a public entity, COUNTY OF LOS ANGELES, a public entity, LOS ANGELES COUNTY BOARD OF SUPERVISORS, a public entity, RONALD L. BROWN, an individual, RUBEN MARQUEZ, an individual, JUSTINE ESACK, an individual, and RICARDO GARCIA, an individual.<br><br>                Defendants. | Case No. 5:25-cv-2721<br><br>**COMPLAINT FOR DAMAGES**<br><br>**CIVIL RIGHTS VIOLATIONS PURSUANT TO 42 U.S.C. § 1983**<br><br>1. **DELIBERATE INDIFFERENCE TO CONSTITUTIONAL VIOLATIONS**<br><br>2. **MUNICIPAL LIABILITY FOR CONSTITUTIONAL VIOLATIONS**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT                                                          CASE NO. 5:25-cv-2721

**INTRODUCTION**

1. Anthony Rubio ("Mr. Rubio" or "Plaintiff") was detained in the Los Angeles County Jail and then the California Department of State Hospitals – Coalinga ("CSH" or "Coalinga State Hospital") for almost fourteen years without recourse for his detention without a trial on a petition for civil commitment per California Welfare and Institutions Code §§ 6600-6604. In the years Mr. Rubio was detained, his public defenders refused to bring him to trial or otherwise challenge his unlawful detention, in violation of his right to due process under the Fourteenth Amendment of the United States Constitution. Further, his public defenders refused to either declare a conflict of interest or inform Mr. Rubio of the nature of the conflict they had declared in his criminal case in 2007, just two years before the SVP petition was filed against him, and/or explain why those facts did not create a conflict for the SVP petition.

2. As a result, Mr. Rubio spent almost fourteen years detained on an SVP petition without a trial and without knowing whether the Public Defender had a conflict of interest in his case, despite his timely and repeated inquiries. Mr. Rubio was finally released when two simultaneous state evaluators found him not to be an SVP, and the District Attorney was unable to proceed. On October 16, 2023, the Los Angeles County Superior Court dismissed the petition and ordered the State Hospital to release him. CSH released Mr. Rubio on October 20, 2023.

3. Under California Welfare and Institutions Code Section 6600, *et seq.*, the Sexually Violent Predator Act (SVPA), "the state can civilly commit individuals found to be SVPs after they conclude their prison terms." *People v. DeCasas*, 54 Cal. App. 5th 785, 802 (2020) (citations omitted).[1] The dual purposes

---

[1] The California Supreme Court recently disapproved *DeCasas*, along with *People v. Tran*, 276 Cal.Rptr.3d 603; *In re Butler*, 269 Cal.Rptr.3d 649; *People v. Bradley*, 264 Cal.Rptr.3d 819; and *People v. Superior Court (Vasquez)*, 238 Cal.Rptr.3d 14, but only to the extent these courts presumed prejudice to the pre-trial detainee based on only the length of pre-trial delay. *See Camacho v. Superior Ct.*, 15 Cal. 5th 354 (2023). These cases were otherwise affirmed. *See id.*

COMPLAINT                                  1                      CASE NO. 5:25-cv-2721

of the SVPA "are to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders." *People v. Superior Court (Vasquez)*, 27 Cal. App. 5th 36, 42 (2018). If the trial court finds probable cause, an alleged SVP is entitled to the following:

> a trial by jury, the assistance of counsel, the right to retain experts or professional persons to perform an examination on his or her behalf, and… access to all relevant medical and psychological records and reports. In the case of a person who is indigent, the court shall appoint counsel to assist him or her, and, upon the person's request, assist the person in obtaining an expert or professional person to perform an examination or participate in the trial on the person's behalf.

*Vasquez*, 27 Cal. App. 5th at 42 (citing former § 6603, subd. (a)).[2] "A unanimous verdict shall be required in any jury trial." *Id.* at 44 (Citing former § 6603, subd. (d)). Proof at trial that a person is an SVP must be beyond a reasonable doubt." *Id.* (citing § 6604).

4.    The SVPA also requires a trial at a meaningful time. *People v. Litmon*, 162 Cal. App. 4th 383 (2008). Delays caused by the defense attorney are attributed to the state rather than to the respondent when there is a breakdown in the defense system. *See Vasquez,* 27 Cal. App. 5th at 56. California courts have found due process violations where the state was responsible for, inter alia, delays of three, five, and twelve years. *See, e.g., Vasquez* 27 Cal. App. 5th at 56; *In re Terrance Butler*, 55 Cal. App. 5th 614 (2020); *People v. DeCasas*, 54 Cal. App. 5th 785 (2020).

5.    Mr. Rubio was detained for almost fourteen years before he was released from detention without ever having a trial. Had a trial taken place, if Mr. Rubio prevailed, he would have been released forthwith.  However, even if Mr. Rubio had been found to be an SVP and had been committed as such, he would

---

[2] All statutory references are to California's Welfare and Institutions Code unless otherwise noted. Citations to former SVPA sections are to the law as it existed in 2013, except where otherwise noted.

COMPLAINT                                    2                        CASE NO. 25-2721

have been entitled to petition the court for release every year thereafter. §§ 6604, 6604.9, 6608(a). Because Mr. Rubio never received a trial, he was never even eligible to petition for his release.

6. Mr. Rubio's public defenders' deliberate indifference to his extraordinarily long and unconstitutional detention violated his civil rights.

7. The Los Angeles Public Defender ("LAPD"), their deputies, and the County of Los Angeles failed to carry out their statutory and ethical duties to Mr. Rubio, in violation of his constitutional rights under 42 U.S.C. § 1983. The present action ("Action") brings to light the complete systemic breakdown and failure of the LAPD's Office, the County of Los Angeles, the County of Los Angeles Board of Supervisors, and the individually named defendants (collectively, the "Defendants") to carry out their statutory and ethical duties, and the injustice caused by these Defendants with respect to a large number of individuals who have been detained for decades without ever having their case adjudicated at trial as required by the United States Constitution.

8. Mr. Rubio is entitled to compensation for the almost fourteen years of his life that he lost because of Defendants' violation of and deliberate indifference to his civil rights, and the harm of being denied his right to defend himself from the civil commitment petition. Mr. Rubio is also entitled to punitive damages to deter future similar conduct, and to ensure that other similarly situated public officials carry out their obligations under the Constitution of the United States.

### JURISDICTION AND VENUE

9. This civil action alleges violations of the Fourteenth Amendment of the United States Constitution as protected by 42 United States Code (U.S.C.) §§ 1983 and 1988. Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

10. Venue is proper in this Court under 28 U.S.C. §§ 1391(b), because all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

COMPLAINT                                    3                         CASE NO. 25-2721

**DIVISIONAL ASSIGNMENT**

11.     Venue is proper in this Court pursuant to Civil Local Rule 3-2(c) because all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

**PARTIES**

A.     **Plaintiff**

12.     At all relevant times, Plaintiff Anthony Rubio was a resident of Los Angeles, California. However, during the events giving rise to this Action, Mr. Rubio was alternately detained in the California Department of Corrections and Rehabilitation (CDCR), in the Los Angeles County Jail, and at the California Department of State Hospitals-Coalinga (CSH), located in Fresno County. He currently resides in San Bernadino County.

B.     **Defendants**

1.     **Defendant Ricardo Garcia**

13.     Defendant Ricardo Garcia has been the Los Angeles Public Defender (LAPD) since 2018. In his role as Public Defender, he is vested by law with the responsibility of administering and supervising the representation of indigent defendants in Los Angeles County at all stages of civil detention and criminal proceedings.

14.     With respect to all alleged conduct taking place between 2018 and the date of this Complaint, Ricardo Garcia acted under the color of law and in the course and scope of his employment with Los Angeles County. He was a high-ranking administrator and policymaker. At no point did he appear as counsel for Mr. Rubio or otherwise represent him. His liability is based on his role as administrator of the Office of the LAPD, as well as his acquiescence in the unconstitutional practices which resulted in Mr. Rubio's harm and damages as alleged in this Action.

15.     As the LA Public Defender, Ricardo Garcia:

COMPLAINT                                     4                          CASE NO. 25-2721

    a.  Developed, adopted, ratified, implemented, modified, abolished, revoked, and rescinded customs, practices, procedures, and policies of the Office of the LAPD;

    b.  Developed and implemented training programs for deputy public defenders;

    c.  Secured budget allocations for specific units, personnel needs, and cases within his office;

    d.  Declared that the Office of the LAPD was unavailable and thereby directed the court to appoint alternate defenders;

    e.  Declared conflicts of interest; and

    f.  Possessed the power to undertake all necessary measures to ensure that any public defender case would be brought to trial in a timely manner.

16. Ricardo Garcia monitored the civil commitment proceedings of Anthony Rubio from 2018 until 2023. He had specific knowledge of the proceedings and was deliberately indifferent to Mr. Rubio's prolonged detention, the LAPD's conflict of interest, and the resulting violation of Mr. Rubio's civil rights.

17. Ricardo Garcia is sued in his personal capacity as a supervisory and administrative employee for his own culpable action or inaction in the training, supervision and/or control of his subordinates. He is also sued in his official capacity for his acquiescence in the constitutional deprivations and for the conduct that showed a reckless or callous indifference to Mr. Rubio's rights. He acquiesced to and ratified his subordinates' practices and policies, which he knew or should have known would inflict a constitutional violation upon Mr. Rubio and others similarly situated.

COMPLAINT                5               CASE NO. 25-2721

## 2. Defendant Ronald L. Brown

18. Defendant Ronald L. Brown was the Los Angeles Public Defender (LAPD) from approximately 2012 until he retired on December 31, 2016. In his role as Public Defender, he was vested by law with the responsibility of administering and supervising the representation of indigent defendants in Los Angeles County at all stages of civil detention and criminal proceedings.

19. With respect to all alleged conduct taking place between 2012 and December 31, 2016, Ronald Brown acted under the color of law and in the course and scope of his employment with Los Angeles County. He was a high-ranking administrator and policymaker. At no point did he appear as counsel for Mr. Rubio or otherwise represent him. His liability is based on his role as administrator of the Office of the LAPD, as well as his acquiescence in the unconstitutional practices which resulted in Mr. Rubio's harm and damages as alleged in this Action.

20. As the LAPD, Ronald Brown:

    a. Developed, adopted, ratified, implemented, modified, abolished, revoked, and rescinded customs, practices, procedures, and policies of the Office of the LAPD;

    b. Developed and implemented training programs for deputy public defenders;

    c. Secured budget allocations for specific units, personnel needs, and cases within his office;

    d. Declared that the Office of the LAPD was unavailable and thereby directed the court to appoint alternate defenders;

    e. Declared conflicts of interest; and

    f. Possessed the power to undertake all necessary measures to ensure that any public defender case would be brought to trial in a timely manner.

COMPLAINT                  6                  CASE NO. 25-2721

21.    Ronald Brown monitored the civil commitment proceedings of Anthony Rubio from 2012 to 2016. He had specific knowledge of the proceedings and was deliberately indifferent to Mr. Rubio's prolonged detention, the Public Defender's conflict of interest, and the resulting violation of Mr. Rubio's civil rights.

22.    Ronald Brown is sued in his personal capacity as a supervisory and administrative employee for his own culpable action or inaction in the training, supervision and/or control of his subordinates. He is also sued in his official capacity for his acquiescence in the constitutional deprivations and for the conduct that showed a reckless or callous indifference to Mr. Rubio's rights. He acquiesced to and ratified his subordinates' practices and policies, which he knew or should have known would inflict a constitutional violation upon Mr. Rubio and others similarly situated.

### 3.    Defendant Ruben Marquez

23.    Defendant Ruben Marquez became the Assistant Public Defender of Los Angeles County in 2014, having joined the Office of the LAPD in February 1990, and was a manager in the Office of the LAPD since 2006. He was vested by law with the responsibility of administering and supervising the representation of indigent defendants in Los Angeles County at all stages of civil detention and criminal proceedings.

24.    With respect to all alleged conduct, Ruben Marquez acted under the color of law and in the course and scope of his employment with Los Angeles County. He was a high-ranking administrator and policy maker. At no point did he appear as counsel for Mr. Rubio or otherwise represent him. Mr. Marquez's liability is based on his role as administrator of the Office of the LAPD, as well as his acquiescence in the unconstitutional practices which resulted in Mr. Rubio's harm and damages as alleged in this Action.

25.    As an Assistant LAPD, Ruben Marquez:

COMPLAINT                                    7                          CASE NO. 25-2721

a. Developed, adopted, ratified, implemented, modified, abolished, revoked, and rescinded customs, practices, procedures, and policies of the Office of the LAPD;

b. Developed and implemented training programs for deputy public defenders;

c. Secured budget allocations for specific units, personnel needs, and cases within his office;

d. Declared that the Office of the LAPD was unavailable and thereby directed the court to appoint alternate defenders;

e. Declared conflicts of interest; and

f. Possessed the power to undertake all necessary measures to ensure that any public defender case would be brought to trial in a timely manner.

26.     Ruben Marquez monitored the civil commitment proceedings of Anthony Rubio from at least 2014, when he took the position of Assistant LAPD, until Mr. Rubio was released. He had specific knowledge of the proceedings and was deliberately indifferent to Mr. Rubio's prolonged detention, the Public Defender's conflict of interest, and the resulting violation of Mr. Rubio's civil rights.

27.     Ruben Marquez is sued in his personal capacity as a supervisory and administrative official for his own culpable action or inaction in the training, supervision and/or control of his subordinates. He is also sued in his official capacity for his acquiescence in the constitutional deprivations and for the conduct that showed a reckless or callous indifference to Mr. Rubio's rights. He acquiesced to and ratified his subordinates' practices and policies which he knew or should have known would inflict a constitutional violation upon Mr. Rubio and others similarly situated.

COMPLAINT                                8                          CASE NO. 25-2721

### 4.    Defendant Justine Esack

28.    Defendant Justine Esack presently is and has been the Chief Deputy Public Defender of Los Angeles County since April 2020, having joined the Office of the LAPD more than 15 years ago.  She recently served as the Head Deputy Public Defender for the Collaborative Courts and Restorative Social Justice. She is and was vested by law with the responsibility of administering and supervising the representation of indigent defendants in Los Angeles County at all stages of civil detention and criminal proceedings.

29.    With respect to all alleged conduct, Justine Esack acted under the color of law and in the course and scope of her employment with Los Angeles County. She was and is a high-ranking administrator and policy maker. At no point did she appear as counsel for Mr. Rubio or otherwise represent him. Ms. Esack's liability is based on her role as administrator of the Office of the LAPD, as well as her acquiescence in the unconstitutional practices which resulted in Mr. Rubio's harm and damages as alleged in this Action.

30.    As the Chief Deputy Public Defender and previously as Head Deputy Public Defender, Justine Esack:

　　　　a.    Developed, adopted, ratified, implemented, modified, abolished, revoked, and rescinded customs, practices, procedures, and policies of the Office of the LAPD;

　　　　b.    Developed and implemented training programs for deputy public defenders;

　　　　c.    Secured budget allocations for specific units, personnel needs, and cases within his office;

　　　　d.    Declared that the Office of the LAPD was unavailable and thereby directed the court to appoint alternate defenders;

　　　　e.    Declared conflicts of interest; and

COMPLAINT                                    9                        CASE NO. 25-2721

f. Possessed the power to undertake all necessary measures to ensure that any public defender case would be brought to trial in a timely manner.

31. Justine Esack monitored the civil commitment proceedings of Anthony Rubio from at least 2020, when she took her current position, and until Mr. Rubio was released. She had specific knowledge of the proceedings and was deliberately indifferent to Mr. Rubio's prolonged detention, the Public Defender's conflict of interest, and the resulting violation of Mr. Rubio's civil rights.

32. Justine Esack is sued in her personal capacity as a supervisory and administrative official for her own culpable action or inaction in the training, supervision and/or control of his subordinates. She is also sued in her official capacity for her acquiescence in the constitutional deprivations and for the conduct that showed a reckless or callous indifference to Mr. Rubio's rights. She acquiesced to and ratified her subordinates' practices and policies which she knew or should have known would inflict a constitutional violation upon Mr. Rubio and others similarly situated.

### 5. Defendant Office of the LAPD

33. The stated mission of the Office of the LAPD ("LAPD") is: "to provide high-quality legal representation to individuals who cannot afford private counsel, ensuring fair treatment within the criminal justice system."[3] The LAPD promotes itself as "oldest, largest, and finest indigent criminal defense agency in the United States."[4] The Office of the LAPD further states: "The Public Defender represents thousands of individuals annually in the Mental Health Court who are subject to criminal and/or civil mental health commitments throughout the county."[5]

---

[3] https://pubdef.lacounty.gov/History, last visited October 11, 2025.
[4] *Id.*
[5] https://pubdef.lacounty.gov/services/mental-health, last visited October 11, 2025.

COMPLAINT                              10                         CASE NO. 25-2721

34.     At all times mentioned herein, Defendant Office of the LAPD was a public entity, and subdivision of Los Angeles County, duly organized and existing under and by virtue of the laws of the State of California and the Charter of Los Angeles County, with the capacity to sue and be sued. The Office of the LAPD is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents, departments, subdivisions, and units, including those handling SVP petitions and other civil commitments.

**6.     Defendant Los Angeles County Board of Supervisors**

35.     The Los Angeles County Board of Supervisors is the legislative and executive body of Los Angeles County government with the capacity to sue and be sued. The Board of Supervisors of Los Angeles County administers local government functions, including the Office of the LAPD.[6] The Los Angeles County Board of Supervisors is also responsible for "the adoption of an annual budget outlining the expenditures of all branches of the County on a fiscal-year basis. . . . The Board supervises the activities of the Chief Executive Officer and all County departments, determines County and special district policies, and sets salaries of County personnel."[7] With respect to all conduct alleged herein, the Board of Supervisors acted under the color of law.

36.     Per its responsibilities to manage, supervise and administer the Office of the LAPD, the Board of Supervisors had the authority to:

      a.    ensure sufficient budget allocations to the PD's Office such that its case load could be properly administered and its clients' cases could be diligently pursued;

      b.    instruct the PD's Office to declare that the PD's Office is "unavailable" or "conflicted" and thereby have a case assigned

---

[6] *See* 1031549_BoardResponsibilities.pdf (lacounty.gov) , last visited October 11, 2025.

[7] *Id.*

COMPLAINT                                    11                            CASE NO. 25-2721

to another public defender agency or to an alternate public defender;

   c. ensure that the PD's Office did not declare a conflict where none existed;

   d. ensure that competent and diligent court-appointed alternate counsel were available for indigent defendants if the PD's Office had an actual conflict, and ensure sufficient budget allocations to the alternate counsel program; and

   e. develop and implement specific training programs for all personnel in the PD's Office, including those handling SVP petitions and other civil commitments.

37. The Board of Supervisors received regular memoranda, emails, reports, budget requests, and other written correspondence and documents from members of the Office of the LAPD regarding the management and operation of its representation of indigent defendants, including the status of the civil detention proceedings of Mr. Rubio, and others similarly situated. The Board of Supervisors, as spelled out herein below, was deliberately indifferent to the violation of Mr. Rubio and other similarly situated detainees' civil rights. As such, the Board of Supervisors was aware of or should have been aware of Mr. Rubio's SVP case, the Public Defender's conflict of interest, the long delay in getting Mr. Rubio's case to probable cause hearing and trial, and the unconstitutional customs and practices which caused the delays in Mr. Rubio's and other similarly situated detainees' cases.

38. The Board of Supervisors' affirmative conduct, as described herein below, includes its acquiescence to and ratification of specific conduct and policies of the Office of the LAPD, which this defendant knew, or should have known, would inflict a constitutional violation upon Mr. Rubio and other similarly situated persons.

COMPLAINT                 12                 CASE NO. 25-2721

**7.    Defendant County of Los Angeles**

39.    At all times mentioned herein, defendant County of Los Angeles is and was a public entity duly organized and existing under and by virtue of the laws of the State of California, with the capacity to sue and be sued. Defendant County of Los Angeles is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents, departments, subdivisions, and agencies.

40.    Defendant County of Los Angeles operates, manages, directs and/or controls the Office of the LAPD, which is also a separate public entity, and is responsible for ensuring that the Office of the LAPD provides competent, diligent counsel to indigent defendants.

**CALIFORNIA'S SEXUALLY VIOLENT PREDATOR ACT: HEALTH & WELFARE CODE SECTION 6600, *ET SEQ.***

41.    California Welfare and Institutions Code Section 6600, *et seq.*, the Sexually Violent Predator Act (SVPA) authorizes the state to "civilly commit individuals found to be SVPs after they conclude their prison terms." *DeCasas*, 54 Cal. App. 5th at 802 (citations omitted). The dual purposes of the SVPA "are to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders." *Vasquez*, 27 Cal. App. 5th at 42. If the requisite number of evaluators agree after a standardized assessment "'that [a] person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody, the Director of Mental Health . . . forward[s] a request for a petition for commitment' to the designated counsel of the county in which the inmate was convicted." *State Dep't of State Hosps. v. Superior Court*, 61 Cal. 4th 339, 345 (2015) (citing Former § 6601, subd. (d), now subd. (i)).

42.    The district attorney files a petition for commitment, and the Superior Court orders the respondent held pending a probable cause hearing which "shall"

COMPLAINT                                         13                                    CASE NO. 25-2721

commence within ten days. §§ 6601, 6601.5. The Superior Court then conducts a hearing to determine whether there is probable cause that the accused person is likely to be an SVP. § 6602. If the Superior Court finds there is no probable cause after a hearing per § 6602, or if the trier of fact finds the petition is not proven beyond a reasonable doubt after a trial, the court dismisses the petition and orders its subject to be released. § 6604.

43. "[I]f the court finds probable cause . . . the court orders a trial to determine whether the person is an SVP under section 6600." *Reilly v. Superior Court*, 57 Cal. 4th 641, 647 (2013). Pending trial, the person can be detained at the State Hospital. § 6602.5. "Though civil in nature, this trial contains a number of procedural safeguards commonly associated with criminal trials, including the alleged SVP's right to a jury trial, to assistance of counsel, and to a unanimous jury finding that he or she is an SVP beyond a reasonable doubt before he or she may be committed." *E.g.*, *Reilly*, 57 Cal. 4th at 647 (internal statutory citations omitted). The right to assistance of counsel includes the right to conflict free counsel. *See, e.g.*, *Lewis v. Mayle*, 391 F.3d 989, 997 (9th Cir. 2004). Upon the alleged SVP's request, appointed counsel shall help the person obtain an independent expert to evaluate him or participate in his trial. § 6603(a). However, while "[t]he constitutional requirement of due process . . . applies to SVPA commitment proceedings and requires a trial within a meaningful time," the "SVPA does not specify a time within which a trial must be held after the court makes a probable cause finding." *DeCasas*, 54 Cal. App. 5th 785 (citations and internal quotation marks omitted).

44. A person ultimately found by a jury to be an SVP is "committed for an indeterminate term to the custody of [the Department of State Hospitals (DSH)] for appropriate treatment and confinement in a secure facility." *Id.* Notably, only once a person is civilly committed pursuant to a jury trial are they entitled to annual examinations "to assess whether the person is still likely to engage in sexually

COMPLAINT 14 CASE NO. 25-2721

violent criminal behavior if discharged." *See State Dep't of State Hosps. v. Superior Court*, 61 Cal. 4th 339, 344 (2015). Further, after a person is committed— not just detained and awaiting trial—they can petition the court to order an independent evaluation if the annual review finds against them. *See* § 6608.

## FACTUAL AND PROCEDURAL BACKGROUND

45.    Anthony Rubio waited in detention for almost fourteen years for a motion and trial that never came. In those almost fourteen years, he was represented by at least five different deputy public defenders. Despite his requests for his public defenders to challenge his unlawful civil detention by bringing a "*Vasquez/Litmon*" motion, bring him to trial, or otherwise provide a plan for his release, his public defenders did not do so. On information and belief, Mr. Rubio's public defenders' notes will reflect these requests, which were made primarily by phone or during in-person visits.

46.    The delay in Mr. Rubio's case and the reasons for the delay of his trial are akin to the facts described and ultimately found to be unreasonable in *People v. Superior Court (Vasquez),* 27 Cal. App. 5th 36, 56 (2018). But the facts of Mr. Rubio's case are in one sense even more egregious: The Office of the Public Defender always had a conflict of interest in Mr. Rubio's case. Mr. Rubio repeatedly demanded to know the basis of the PD's declared conflict of interest in his criminal case, so that he could understand the LAPD's posture in the SVP petition. He was not allowed to have this information. Early in the proceedings, Mr. Rubio brought a motion substitute new counsel per *People v. Marsden*, 2 Cal. 3d 118 (1970), but the court denied it.

47.    Further, Mr. Rubio was a victim of Friar Bond when Mr. Rubio was an altar boy in the Roman Catholic Archdiocese of Los Angeles, 1969-1971. Also, at least one evaluator found that Mr. Rubio's offenses were situationally mediated, rather than due to an internal disorder predisposing Mr. Rubio to sexual crimes.

COMPLAINT                              15                         CASE NO. 25-2721

These facts would have been relevant and admissible if the LAPD tried Mr. Rubio's case.

48.     In contrast to *Vasquez* and other like California cases, Mr. Rubio did not have the opportunity to litigate his right to a speedy trial, because his case was dismissed when two simultaneous, separate evaluators found him not to be an SVP. Unfortunately, this was only after he spent almost fourteen years in unnecessary, unlawful, and unconstitutional pretrial civil detention.

49.     The superior court ordered that the SVP petition against Mr. Rubio be dismissed on October 16, 2023. Upon his release on October 20, 2023, at the age of 67, Mr. Rubio returned to Los Angeles. At present, he resides in San Bernadino County.

**A.     The LAPD Declared a Conflict of Interest in Mr. Rubio's Underlying Criminal Case 2.5 Years Before the DA Filed the SVP Petition.**

50.     On September 24, 1997, in Los Angeles County Superior Court Case No. NA027957, a jury found Mr. Rubio guilty of five counts of California Penal Code (PC) § 286(b)(2), sodomy of a person under 16, five counts of PC § 288(A)(b)(2), oral copulation of a person under 16, and one count of PC § 288(A), lewd act on a child. Mr. Rubio committed these crimes in 1992-93.

51.     On November 6, 1997, the superior court sentenced Mr. Rubio to twenty-five to life under the Three Strikes law.

52.     A few months later, on January 16, 1998, the court determined that the court, Mr. Rubio's counsel, and the prosecutor had overlooked that Three Strikes did not apply, because it was not yet enacted at the time of the offenses. The court re-sentenced Mr. Rubio to a determinate term and remanded him to state prison.

53.     Nine years later, on April 3, 2007, the court reversed the judgment and remanded the case to the trial court for remittitur. The court appointed the LAPD, but on June 5, 2007, the LAPD and the Alternate Public Defender both declared conflicts of interest, and the court appointed private counsel. Neither the LAPD nor

COMPLAINT                              16                          CASE NO. 25-2721

the Alternate Public Defender stated on the record or privately to Mr. Rubio the reasons for their conflicts.

54.    On September 20, 2007, the court resentenced Mr. Rubio to thirteen years state prison, with credit for time served and a release date of August 3, 2009. Ultimately, his release date was extended to November 2009 based on CDCR administrative actions.

**B.    The LAPD Nonetheless Accepted Appointment on Mr. Rubio's SVP Case and Then Proceeded to Repeatedly Requested Pre-Trial Continuances While Failing to Advocate for Mr. Rubio or Disclose The Nature of their Prior Conflict.**

55.    On December 21, 2009, the District Attorney filed an SVP petition against Mr. Rubio. The court appointed the LAPD, and the LAPD accepted the appointment.

56.    Over the next almost fourteen years, at least five deputy public defenders represented Mr. Rubio.

57.    Mr. Rubio was detained in L.A. County Jail, without sex offender treatment, for approximately two years before the court transferred him to Coalinga State Hospital.

58.    Mr. Rubio's first deputy public defender, Stacy Griffith, wrote him one letter, informing him of the LAPD's physical address change.

59.    Attorney Griffith told Mr. Rubio he had no chance at trial. She waived time for his probable cause hearing, and she never proceeded to that hearing.

60.    Beginning in at least 2010, the Archdiocese offered Mr. Rubio access to individual therapy upon release, due to Mr. Rubio's status as a child victim of a priest, and Mr. Rubio discussed this with the LAPD paralegal and Attorney Griffith. However, the Archdiocese's Victim Assistance Coordinator informed Mr. Rubio that the Archdiocese could only help him upon release and not while detained.

61.    Attorney Griffith retained a defense psychological evaluator.

COMPLAINT                                17                          CASE NO. 25-2721

62. Deputy Public Defender Griffith yelled at Mr. Rubio, called him a monster, and said, "you're sick." She did not appear to understand SVP defense practice.

63. On September 26, 2011, Dr. Vianne Castellano, psychologist, informed Mr. Rubio that Attorney Griffith had a low opinion of him.

64. On July 18, 2011, Mr. Rubio met with an LAPD paralegal and told him he did not trust Attorney Griffith.

65. On October 28, 2011, Mr. Rubio met with an LAPD paralegal and told him of his concerns about Attorney Griffith.

66. Mr. Rubio requested a new attorney via *Marsden* motion, 2 Cal. 3d 118, but the court denied the motion.

67. In 2015, six years into Mr. Rubio's pre-trial detention, Mr. Rubio's second deputy public defender, David Santiago,[8] successfully litigated a *Ghilotti* motion to correct the evaluators' reports due to error per *People v. Superior Court,* 27 Cal. 4th 888 (2002). Mr. Santiago then proceeded to bring the matter to a probable cause (PC) hearing—six years into Mr. Rubio's detention on the SVP petition. Mr. Santiago moved to exclude hearsay from the PC hearing. Mr. Santiago obtained a stipulated protective order regarding results of polygraph and penile plethysmograph (PPG) assessments. Mr. Santiago wrote Mr. Rubio a detailed letter containing legal advice regarding these assessments. Mr. Santiago also moved for and gained an order protecting a defense-retained psychological evaluation from disclosure.

68. Mr. Santiago was then transferred out of the SVP unit. This transfer prejudiced and delayed Mr. Rubio's defense.

69. Mr. Rubio's third deputy public defender was Christina Behle.[9]

---

[8] *See also infra* footnotes 17-31.
[9] *See also infra* footnote 27.

COMPLAINT                                18                           CASE NO. 25-2721

70. Mr. Rubio's fourth deputy public defender, Karen Osborne, wrote him a cover letter for a document she copied for him. The letter also advised that the LAPD paralegal would visit Mr. Rubio. Ms. Osborne also wrote Mr. Rubio a greeting card.

71. Mr. Rubio's fifth public defender, Natalie Parisky, wrote him a letter informing him that the paralegal would call to complete a document needed for outpatient treatment. She wrote a letter advising that the outpatient treatment program is certified. She also wrote a letter about copying the same document Ms. Osborne copied two years prior.

72. On information and belief, among Mr. Rubio's at least five deputy public defenders, only Mr. Santiago brought motions and conducted a contested hearing. He was then transferred off the unit.

73. Each new deputy public defender told Mr. Rubio they were starting his case over. The changes in staff slowed down the defense of the case.

74. Mr. Rubio asked each of his attorneys why the LAPD declared a conflict of interest in his criminal resentencing in 2007, but they told him he was not entitled to know. He asked how the conflict resolved and how he could be confident it did not impair his representation in the SVP case, but no one gave him any information.

75. A paralegal told Mr. Rubio that the attorneys did not want Mr. Rubio to have the information about the conflict in the criminal case. On another occasion, the paralegal told Mr. Rubio the conflict was because the LAPD represented one of his victims in criminal court. Then, the paralegal called Mr. Rubio back and attempted to withdraw that comment.

76. On August 5, 2021, an LAPD paralegal sent Mr. Rubio a copy of the minute order from the June 5, 2007, appearance in which the LAPD declared a conflict of interest in Mr. Rubio's criminal case, with a note stating, "I apologize for sending the wrong minutes last time."

COMPLAINT                                    19                          CASE NO. 25-2721

77.     After years of continuances, on January 4, 2021, PD Parisky set a jury trial date of April 25, 2021. On request of defense counsel, the court later continued the trial date, then vacated it. In April 2022, counsel informed the court the matter might resolve.

78.     The court continued the case from time to time for eighteen months.

79.     Mr. Rubio requested a speedy trial motion, and his deputy public defender told him he did not qualify, even though the court repeatedly asked Attorney Pariskey why the case was dragging on so long and informed her the case was taking too long.

**C.     Mr. Rubio Was Diligent in Seeking to Enforce His Rights While He Was Detained in Coalinga State Hospital.**

80.     Mr. Rubio told his public defenders either over the phone or at in-person visits at DSH-C that he wished to secure his release.  On information and belief, Mr. Rubio's public defenders recorded these conversations in their notes to Mr. Rubio's file.

81.     Mr. Rubio brought a *Marsden* motion during the period when he was represented by PD Griffith, his first appointed public defender.

82.     Additionally, as described above, Mr. Rubio told his PD that he wished to file a *Vasquez/Litmon* motion but was told he did not qualify.  (As the California Supreme Court has recently affirmed, evidence of requests for trial is but one of four factors considered by courts in determining whether a pre-trial detainee has suffered a due process violation under the rationale applied in *Vasquez*. *See Camacho v. Superior Ct.*, 15 Cal. 5th 354 (2023)). Because the LAPD could not itself file a *Vasquez* motion, they would have been required to declare a conflict so that Mr. Rubio could receive new counsel before filing that motion.  The LAPD did not declare a conflict in Mr. Rubio's case.

83.     While Mr. Rubio was detained in CSH, he had little to no meaningful access to legal resources.  Although CSH had a "law library," this law library

COMPLAINT                                20                        CASE NO. 25-2721

consisted of seven computers that served about 1,500 patients.  There was no reservation or appointment system, and it could take several months to get access to a computer.

84.    The law library computers did not have internet access. Rather, they received periodic update disks, and thus there was a time lag in access to changes in the law. Further, the updates were not regularly and timely maintained, so they did not function as intended. If a patient wanted to read a recent case or statute, they had to ask their attorney to send it by mail.

85.    Additionally, the law library computers were often not working and were waiting for repair.

86.    Patients had to be computer literate to do legal research and save their research, yet CSH did not provide training on computer literacy or use of the law library computers. Unlike in prison, there were no law clerks.

87.    Patients also could not save legal research electronically. If a patient was able to get access to the computers, in order to save their searches they had to cut and paste into a document and print it for 10 cents per page.  In light of the lack of resources available to patients, including Mr. Rubio, this was prohibitively expensive.

88.    Access to the law library computers was further restricted because it was not available on the residential units. The residential units had no legal materials in any format. Patients were often restricted to their units on "lockdown," which could be triggered by a variety of events.  Beginning in 2017, CSH was on nearly perpetual lockdown due to a number of causes including norovirus, influenza virus, and searches for contraband following a change in the regulations regarding patient access to electronic files (section 4350 of Title 9, California Code of Regulations) (referred to hereinafter as "4350").

89.    Like the law library computers, the patient post office is off-unit.

COMPLAINT                                21                          CASE NO. 25-2721

90.    Mr. Rubio also had insufficient access to telephones to pursue his legal claims while in CSH. Each unit of 50 people had a total of four landline phones: two incoming and two outgoing.  The outgoing phone lines could only be used to call collect; the patients were not allowed to own or possess calling cards, although some patients used calling-card numbers provided by their families.  Access to the phones was so limited that some patients physically fought over access to the outgoing phones.

91.    Patients did not have access to a fax machine at all.

92.    Patients had to pay for their outgoing calls with family members' calling cards if they had them or call collect. Prior to 2020, patients did not earn minimum wage. Rather, they earned $1/hr, with a maximum of $52/month. In addition, there were only 600 jobs for 1400 patients, so patients received jobs on rotation. Patients also received a stipend of $12.50 per month with which they were supposed to afford all necessities such as printing, phone calls, stamps, envelopes, and toiletries.

93.    Prior to the 4350 lockdowns, which began in 2017, patients were able to leave their units almost every day.  Then for the next few years, it dwindled to once a week, then once a month, then every two months, unless a patient was an essential worker or otherwise qualified for an exception to lockdown.

94.    Also, as a result of 4350-related restrictions, beginning in 2017, patients had storage for only a very limited amount of paper printed material; any material in excess of the amount allowed for storage was confiscated and/or had to be stored in a locked location without free access. Thus, legal materials such as trial records of prior convictions, hearing transcripts, or exhibits to motions, were almost impossible to review in written form due to their length.

95.    Additionally, after the 4350 regulations, patients were no longer allowed electronic storage devices (e.g., thumb drives) on which they could review electronic materials downloaded from the law library.  Furthermore, there was no

COMPLAINT                    22                    CASE NO. 25-2721

opportunity to print the contents of thumb drives that were seized when 4350 arose. Thus, all previously electronically stored research was lost. Therefore, at all times, but especially after 2017, it was almost impossible to gain meaningful access to legal materials.

96.    On information and belief, prisoners within the California Department of Corrections ("CDCR") have better access to law libraries and the resources needed for legal defense, such as law books and journals and the ability to print and save searches, than do pre-trial civil detainees. In addition, prison law libraries are staffed with inmate law clerks who can assist others, whereas at CSH there is no assistance with the computers or with the materials themselves.

**D.    The Los Angeles County Superior Court Dismissed the District Attorneys' SVP Petition.**

97.    Although Mr. Rubio continued to request that his attorneys challenge his detention, Mr. Rubio also successfully completed treatment, realizing that, unfortunately, his own efforts were his only meaningful path to release.

98.    Over the course of his 14 years of unlawful detention, Mr. Rubio received positive feedback and reports of completion of treatment goals and progress, and he graduated to Module 4 of the Sex Offender Treatment Program.

99.    By October 2023, DSH evaluators Craig King and Dana Putnam found that Mr. Rubio **did not** meet the criteria for commitment as an SVP pursuant to § 6600.

100.    The Superior Court dismissed the SVP petition against Mr. Rubio, and he was released on October 20, 2023, after almost 14 years of detention without a trial.

**E.    Mr. Rubio Was, Unfortunately, the Rule, Not the Exception.**

101.    A September 2020 report by the California Sex Offender Management Board (CASOMB), titled Sexually Violent Predator Project: Introduction & Duration of SVP Detainee Status noted that "[t]he total number of individuals ever

COMPLAINT                                23                                CASE NO. 25-2721

committed as SVPs represents less than 1% of all individuals registered as sexual offenders in California." Yet "California's SVP program has more inpatients than any of the 21 states with 'Sexually Violent Predator' laws."[10] The report goes on to state:

> The current census of nearly 1,000 total SVPs represents roughly 15% of the national total and is comprised of detainee (WIC6602, Probable Cause) and fully committed (WIC6604) categories. ***California has the highest number of detainees nationally, representing nearly half its total SVP population***. Not just the number of detainees is exceptional, but also the duration of detainee status is much longer than that of other states with SVP programs.[11]

102. Perhaps as a result, the California Sex Offender Management Board's Year-End Report to Legislature 2020 recommended a number of changes to the implementation of California's SVP law and states:

> California's number and duration of detainees make its Sexually Violent Predator (SVP) law implementation highly atypical compared to other states with similar laws, and severely compromises its efficiency and efficacy. ***It gives rise to procedural due process concerns.*** It takes an extraordinarily long time for individuals to get processed through SVP commitment proceedings, while being involuntarily detained past their prison sentence, all at an excessive cost. For the portion of detainees that will go on to get committed, the lengthy duration of proceedings is time wasted where they could have applied themselves meaningfully in treatment. ***For the portion of detainees that eventually do not get committed, the years lost to pending commitment proceedings are an unfair and unnecessary loss of liberty***.
>
>         . . .
>
> CASOMB finds the efficacy and efficiency of California's SVP program are severely compromised by having too many detainees that are held for too long pending trials. . . . ."[12]

---

[10] CAL. SEX OFFENDER MGMT. BD., SEXUALLY VIOLENT PREDATOR PROJECT: INTRODUCTION & DURATION OF SVP DETAINEE STATUS, at 1, Sept. 2020, *available at* 2020_CASOMB_Annual_Report.pdf (citations omitted, emphases added).

[11] *Id.* (emphasis added).

[12] CAL. SEX OFFENDER MGMT. BD., YEAR-END REPORT TO LEGISLATURE 2020, at 22-23, Feb. 2021, *available at* 2020_CASOMB_Annual_Report.pdf.

COMPLAINT                                    24                            CASE NO. 25-2721

103. Notably, the CASOMB Year-End Report found that "[t]he detainees at the state hospital *awaiting commitment proceedings* have been there for an average of six years, and twenty-five percent (25%) have been there more than 10-years [citation]. Roughly, six out of ten detainees [only slightly more than half] have been eventually fully committed."[13]

104. Unsurprisingly, the exceptional delays in receiving a trial experienced by other SVP detainees represented by the LAPD have already been found unconstitutional. The Superior Court granted motions to dismiss or petitions for writs of habeas corpus due to excessive delay in the cases of *People v. Superior Ct. (Vasquez)*, 27 Cal. App. 5th 36 (2018) and *People v. DeCasas*, 54 Cal. App. 5th 785 (2020). *See People v. Ballardo*, Case No. B290567, 2022 WL 906421, (Cal. App. 2 Dist., Mar. 29, 2022), rev. granted (Jun 29, 2022) (Cal. Supreme Court Case No. S274469) (remanded after determination of *Camacho v. Superior Ct.*, 15 Cal. 5th 354 (2023));[14] *see also Mendoza v. County of Los Angeles, et al.*, Case No. 2:23-cv-3410, another similar case arising out of the LAPD currently pending in this Court.

105. Mr. Rubio's exceptionally long and unconstitutional pre-trial detention is the result of the custom and practices of the LAPD, which was ratified by the County of Los Angeles through its Board of Supervisors, the final policy-making organization for the County of Los Angeles, when, for example, it approved significant cuts to the LAPD budget despite the LAPD's awareness that such cuts could (and did) lead to significant impediments in the representation of indigent alleged SVP clients.

106. For example, in 2014, five years after the petition against Mr. Rubio was filed,

---

[13] *Id.* at 23 (emphasis added).

[14] *See supra* note 1, and related text.

COMPLAINT                                    25                                    CASE NO. 25-2721

> Osaki, the deputy-in-charge of the SVP unit in 2014, expressed his concerns about [a proposed] staff reduction in two memos to senior management within the public defender's office. In a memo sent in April 2014, Osaki stated that the then-proposed cuts and resulting increase in workloads would cause the remaining attorneys to be "less efficient in handling their cases" and "the competency of their practice may be challenged. In other words, no lawyer can be competent with such an added workload in such a short period of time."
>
> Osaki sent his second memo in August 2014, after the first round of cuts and before a proposed second round. He stated that "[t]he attorney staff has been significantly impacted as a result of the staff reductions" and that "each attorney has had difficulty with their increased workload." "As a result of the increases in their workload," Osaki continued, "the staff has expressed concerns over their ability to effectively and competently represent their clients on what are ostensibly life cases." The cuts, he concluded, "ha[ve] placed the SVP [b]ranch in an untenable situation of being ineffective. Any further cuts could lead to legal liabilities." Osaki later testified that he used this language to implicate their clients' federal constitutional rights to the effective assistance of counsel.

*DeCasas*, 54 Cal. App. 5th at 795-96.

107. At the same time, "[o]ther attorneys within the SVP unit wrote an anonymous memo to the public defender on April 24, 2014. The then-prospective 50 percent reduction of staff, the attorneys stated, would 'be devastating to [their] ability to effectively represent [their] clients' and 'result in the ineffective and incompetent representation of [their] clients.'" *Id.* at 796.

108. Additionally, "[i]n September 2014, SVP unit attorneys wrote anonymously ***to the members of the Los Angeles County Board of Supervisors and the State Bar of California***. . . . To the Board of Supervisors, the attorneys stated that the staffing cuts would result in their abandonment of some clients, who would then 'have a viable lawsuit against the county.' The letter to the State Bar accused the public defender and the assistant public defender of 'jeopardizing the representation of [their] clients ... and placing the lawyers in the untenable position of either [violating their clients' rights to effective assistance of counsel] or effectively abandoning their clients.' . . . The lawyers further asserted that the

COMPLAINT                              26                         CASE NO. 25-2721

public defender and 'the chief deputy' 'have failed to properly discharge their responsibilities and in turn they have placed the lawyers in their charge at risk for claims of ineffective assistance of counsel.' The lawyers accused the public defender of 'repeatedly violat[ing] [r]ule 3-110(A) of the Rules of Professional Conduct by failing to ensure that the lawyers have appropriate resources so that they are able to competently represent their clients.'" *DeCasas*, 54 Cal. App. 5th at 795–96 (Emphasis added, alterations in original, footnote omitted).

109. And in June 2015, six years after the petition against Mr. Rubio was filed, "***attorneys again wrote to the Board of Supervisors***, stating that 'the conditions at the public defender's office continue to deteriorate under the chaotic management of [the public defender and chief deputy],' and that their 'improvident management style ... continues to expose the county to liability.'" *DeCasas*, 54 Cal. App. 5th at 796 (Emphasis added, alterations in original).

110. One public defender "testified that the fact that public defenders were delaying their cases as a result of the staffing cuts was not a 'secret. It was very, very open and it was said in open court repeatedly by many, many public defenders.' Personally, he was assigned 'five or six new cases' as a result of the staffing cuts, and became 'overwhelmed.'" *DeCasas*, 54 Cal. App. 5th 785, 796-97.

111. Based on the above, it is reasonable to infer that the Los Angeles Board of Supervisors was aware of the conditions that were likely to give rise to a violation of Mr. Rubio's Constitutional due process rights.

F.    **Mr. Rubio Experienced Significant Physical and Emotional Distress as a Result of His Unconstitutional Nearly Fourteen-Year Detention.**

112. While detained at the Los Angeles County Jail and Coalinga State Hospital awaiting a probable cause hearing and trial, Mr. Rubio experienced significant physical and emotional injury and distress.

113. When Mr. Rubio was transferred from CDCR to jail, he was not segregated from mainline inmates while he was booked in. He experienced extreme

COMPLAINT                                27                        CASE NO. 25-2721

fear, because he was vulnerable to attack as he was handcuffed to the bench while being processed into jail.

114.    In his approximately two years at County Jail, Mr. Rubio feared for his safety, due to incidents of inmates assaulting other inmates with knives. The civil detention pod was not protected from contact with mainline pods.

115.    The sheriff's deputies verbally abused Mr. Rubio, calling him "faggot," "sicko," and a slur for child molester in front of mainline inmates, which appeared to invite violent attacks. This occurred in locations throughout the jail and other detention areas, including during transportation, in the elevator, in the hospital, and in the holding tank.

116.    When Mr. Rubio was taken in custody to the general hospital for medical treatment, the detention staff openly ridiculed him and repeatedly broadcast his status as a SVP detainee to medical staff, stating, "let's hope he never gets out." This put Mr. Rubio in fear.

117.    The red jumpsuit Mr. Rubio was required to wear in jail identified him as a sex offender to general population prisoners who were known to harm civil detainees, and yet he was not adequately segregated from physical contact with general population prisoners.

118.    The detention officers often allowed mainline inmates to be near the civil detainees, putting Mr. Rubio in fear of being attacked.

119.    Mr. Rubio was physically abused by law enforcement at the jail. The officers pushed Mr. Rubio against the wall and pinned him with their feet while he was made to stand spread-eagle. Mr. Rubio felt bullied by law enforcement, especially going to and from court.

120.    At jail, Mr. Rubio was ridiculed because he was detained as a potential SVP, and he suffered due to always feeling his safety was at risk.

121.    At DSH-C, certain law enforcement officers harassed, bullied and hazed Mr. Rubio. Other officers were professional and compassionate.

COMPLAINT                                    28                          CASE NO. 25-2721

122.   At DSH-C, Officer Moreno routinely called Mr. Rubio "faggot" and other derogatory names. This was detrimental to his progress in treatment.

123.   Mr. Rubio was physically abused by law enforcement at CSH. As at the county jail, certain officers pushed Mr. Rubio against the wall and pinned him with their feet while he was made to stand spread-eagle.

124.   Mr. Rubio's personal property and legal paperwork were periodically damaged, lost, and/or destroyed in frequent searches of his unit.

125.   Although he was a civil detainee, Mr. Rubio was shackled every time he was transported to any outside medical appointment.

126.   Mr. Rubio was required to sleep in the gymnasium with other patients who were sick as a makeshift COVID procedure. It appeared that the institution did not possess or create an adequate emergency response.

127.   The repeated change in public defender attorney staff, and the conflicting information the different attorneys provided, caused Mr. Rubio emotional and mental strain, and stress which affected him physically.

128.   Mr. Rubio also suffered from the emotional distress caused by the uncertainty resulting from a pre-trial detention of potentially infinite duration, and in particular, the fear that the LAPD could not be his zealous advocate because of a conflict of interest. Mr. Rubio suspected, and continues to suspect, that the LAPD represented one or more of his victims and that that was the source of their 2007 declaration of conflict of interest. Mr. Rubio suspected and continues to suspect the LAPD's representation of him was impaired by their duty to his victims whom the LAPD might represent.

129.   Because he was a child victim of Church sexual abuse, Mr. Rubio would have had access to individual therapy provided by the Archdiocese of Los Angeles had he not been detained in DSH-C.

130.   When Mr. Rubio was released from Coalinga, his sister gave him shelter for a short time, but after that, he was homeless and living on the street for

COMPLAINT                               29                          CASE NO. 25-2721

about eighteen months because of the difficulty of finding housing after a long detention, in combination with his California Penal Code (PC) § 290 sex offender registration status.

131. Mr. Rubio suffered and continues to suffer depression, emotional harm, anger, sadness, fear, lack of trust, lack of self-esteem, and symptoms of trauma and PTSD resulting from his unconstitutional detention.

132. Mr. Rubio's family members visited him at County Jail while he was detained on the SVP petition.

133. Mr. Rubio's stepfather, Jack Horton, died in 2013 while Mr. Rubio was detained at DSH-C. Jack was the relative with whom Mr. Rubio had the closest relationship. Mr. Rubio could not visit Jack prior to his death due to his pre-trial detention, which caused him significant emotional distress.

134. Mr. Rubio's older brother, Joseph, died while Mr. Rubio was detained at DSH-C.

135. Mr. Rubio's younger brother, Richard, died March 1, 2024, soon after Mr. Rubio was released from DSH-C. Richard was living with Mr. Rubio and their sister when he died.

136. Mr. Rubio's older brother, Gilbert, died soon after that, in December 2024.

137. Mr. Rubio lost years of family relationship because of his prolonged unlawful detention.

///

///

///

///

COMPLAINT                              30                        CASE NO. 25-2721

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (DELIBERATE INDIFFERENCE CAUSING A CONSTITUTIONAL VIOLATION OF RIGHTS PURSUANT TO 42 U.S.C. § 1983 —AGAINST DEFENDANTS GARCIA, MARQUEZ, OFFICE OF THE LAPD, LOS ANGELES COUNTY BOARD OF SUPERVISORS, AND COUNTY OF LOS ANGELES)

138.   Plaintiff hereby incorporates and realleges each and every allegation set forth above as though fully set forth herein.

139.   This action is brought pursuant to 42 U.S.C. § 1983 for violation of Mr. Rubio's due process rights under Fourteenth Amendment.

140.   Defendants Ronald L. Brown, Ruben Marquez, Justine Esack, Ricardo Garcia, the Office of the LAPD, the Los Angeles County Board of Supervisors, and the County of Los Angeles, are sued herein as administrators of the Office of the LAPD.

141.   Defendants Garcia, Brown, Marquez, and Esack did not represent Mr. Rubio as a trial attorney or appear as counsel for Mr. Rubio in any of the underlying SVP proceedings described herein. As such, liability against these defendants is not based on these defendants acting within the scope of legal representation of Mr. Rubio.

142.   Defendants Garcia, Brown, Marquez, and Esack, pursuant to policies and practices, failed to inform Mr. Rubio of his right to a speedy trial, failed to inform Mr. Rubio of his right to appear on his own behalf, failed to meaningfully challenge Mr. Rubio's proposed civil commitment, failed to timely bring Mr. Rubio's SVP petition to PC hearing and trial, failed to institute training programs for handling SVP petitions and civil commitments to ensure that Mr. Rubio's trial would take place in a timely manner, and failed to ensure that he received competent, diligent and conflict-free counsel, let alone did they "provide high-quality legal representation . . . ensuring fair treatment within the criminal justice

COMPLAINT                              31                          CASE NO. 25-2721

system" as promised by the LAPD. By thus abandoning their ethical and statutory duty to Plaintiff, said defendants allowed Plaintiff to be held as a pre-trial detainee for such an inordinately long period of time that his due process rights were violated.

143.   Defendants Garcia, Brown, Marquez, and Esack, were specifically aware that their subordinates were not providing diligent counsel to their SVP clients and that the failure to bring those clients to trial violated their constitutional rights. Defendants Garcia and Brown failed to act to prevent the attorneys of the LAPD from engaging in the acts and omissions described herein, which they reasonably should have known would deprive Mr. Rubio and other similarly situated SVP clients of their rights. As a direct result of the deliberate indifference of these defendants, Mr. Rubio endured 14 years in detention waiting for his case to come to trial before it was finally dismissed.

144.   On or before Mr. Rubio's underlying petition was dismissed, there existed within the Office of the LAPD various customs and practices, as alleged herein, which caused the delay in Mr. Rubio's case being brought to trial and which caused Mr. Rubio to unnecessarily spend more than a decade as a pre-trial detainee waiting for his case to be brought to trial.

145.   Defendants Garcia, Brown, Marquez, and Esack, the LAPD, and the County of Los Angeles Board of Supervisors were specifically aware of the inordinate and excessive delay that Mr. Rubio and numerous other SVP detainees were experiencing in the processing of their cases and that Plaintiff's case and the other cases were not being challenged or brought to trial on a timely basis. Said defendants were aware of the customs and practices described above that existed at the SVP Unit with respect to SVP detainees and which were the causes of the failure to bring these cases to trial in a timely fashion.

146.   Despite knowing of the great magnitude of the delays in litigating SVP cases and bringing Mr. Rubio and other similarly situated SVP Detainees to trial,

COMPLAINT                          32                          CASE NO. 25-2721

Defendants Garcia, Brown, Marquez, and Esack, the LAPD, and the County of Los Angeles Board of Supervisors failed to take any reasonable measures to ensure that the constitutional rights of Mr. Rubio were protected when he was a client of the LAPD's Office.

147. The above-described failures constituted deliberate indifference to the due process rights of Mr. Rubio.

148. Defendants Garcia, Brown, Marquez, Esack, the LAPD, and the County of Los Angeles Board of Supervisors knowingly refused to terminate the acts, customs, practices, and misconduct of their subordinates, which they knew were causing and would cause constitutional injury upon the SVP detainees in their charge. Said defendants failed to take reasonable measures to institute internal measures and training programs within the SVP Unit with respect to SVP detainees to ensure their attorneys fulfilled their ethical duties to zealously protect the interests of their clients, failed to address the long delays in getting SVP cases to trial, failed to institute new training of their subordinates in the management of SVP cases so as to ensure that SVP cases were litigated and got to trial in a timely fashion, failed to discipline their subordinates for failing to proceed in a timely fashion, and failed to identify and/or declare conflicts.

149. The above-described failures on the part of Defendants Garcia, Brown, Marquez, and Esack, the LAPD, and the County of Los Angeles Board of Supervisors constituted an acquiescence in the constitutional deprivations that resulted or constituted a reckless and callous indifference to the rights of SVP detainees, including Mr. Rubio.

150. As a result of the above deliberate acts and omissions of Defendants Garcia, Brown, Marquez, and Esack, the LAPD, and the County of Los Angeles Board of Supervisors, Mr. Rubio was damaged and injured as alleged above by being made to endure a wrongful 14-year pre-trial detention.

COMPLAINT                                    33                        CASE NO. 25-2721

151.   The conduct of Defendants Garcia, Brown, Marquez, Esack, the LAPD, and the County of Los Angeles Board of Supervisors, as alleged above, was done with deliberate indifference to the constitutional violations endured by Mr. Rubio. As such, punitive damages should be imposed, in an amount sufficient to punish the named defendants and to deter future similar conduct by these defendants and others in similar positions.

## SECOND CLAIM FOR RELIEF

### (MUNICIPAL LIABILITY FOR VIOLATION OF CONSTITUTIONAL RIGHTS AS TO DEFENDANTS OFFICE OF THE LAPD, COUNTY OF LOS ANGELES, AND COUNTY OF LOS ANGELES BOARD OF SUPERVISORS)

152.   Plaintiff hereby incorporates and realleges each and every allegation set forth above as though fully set forth herein.

153.   This action is brought pursuant to 42 U.S.C. § 1983 for violation of Plaintiff's rights under the Fourteenth Amendment.

154.   Plaintiff's due process rights were violated by the egregious delay in challenging his detention or bringing his case to trial as determined by the Los Angeles Superior Court and as alleged above in the first claim for relief. As a result of the acts and omissions of the LAPD, the County of Los Angeles, and the County of Los Angeles Board of Supervisors, as described above, Mr. Rubio's Fourteenth Amendment due process rights were violated.

155.   At the time of these constitutional violations by said defendants, the LAPD had in place, and had ratified widespread customs and practices, which permitted and encouraged attorneys in the LAPD to delay litigating SVP cases, which violated the due process right of their SVP clients, including Mr. Rubio.

156.   These practices, customs, policies, and procedures included:[15]

---

[15] The sources cited *supra* (Paragraph 160 subparagraphs (a) through (p)) are cited not for the truth of the facts quoted or for their legal authority, but rather as evidence for pleading purposes that it is plausible that the conduct complained of by Plaintiff was a formal or informal custom, policy, or practice, of the LAPD, during

> a. waiving or delaying probable cause hearings;[16]
>
> b. waiving SVP client/detainees' appearance at hearings without securing their authority to do so;[17]

---

the time period of Mr. Rubio's unconstitutional detention, and that it is plausible that the individual and entity defendants were aware of such conduct and the likelihood that a Constitutional violation would result.

[16] *See, e.g.*, *Vasquez*, 27 Cal. App. 5th at 45 (17-month delay between filing of petition and first probable cause hearing); *see also id.* at 47) (Vasquez's Los Angeles public defender in 2010 "represented that Vasquez had waived time for trial. The [second] probable cause hearing setting was continued multiple times to enable counsel to receive . . . updated evaluations. On January 3, 2012 Vasquez was present when the trial court continued the probable cause hearing at [the public defender's] request to February 1, 2012; the hearing was later continued multiple times without Vasquez present, and ultimately was set for January 8, 2013."); *DeCasas*, 54 Cal. App. 5th 785, 790 ("The court appointed the Los Angeles County Public Defender to represent DeCasas. Deputy Public Defender Craig Osaki . . . waived DeCasas's right to a probable cause hearing and the court ordered DeCasas to 'remain in custody in a secure facility' pending trial.'" (Emphasis added)); *see also People v. Ballardo*, No. B290567, 2022 WL 906421, at *1 (Cal. Ct. App. Mar. 29, 2022), *rev. granted* (June 29, 2022), *rev. dismissed, cause remanded* (Nov. 1, 2023) (alleged SVP "denied the petition and waived his probable cause hearing"); *People v. Barrcena*, No. B289917, 2020 WL 4435548, at *1 (Cal. Ct. App. Aug. 3, 2020) (In 2007, "Defendant [an accused SVP] waived his statutory right to have the [probable cause] hearing held within 10 days.").

[17] *See, e.g., Vasquez*, 27 Cal. App. 5th at 46 ("On May 5, 2010 [10 years after the petition was filed against him] Vasquez purportedly signed a waiver of appearance and speedy trial rights pursuant to *People v. Litmon* (2008) 162 Cal.App.4th 383, 399-406, . . . . The copy of the waiver provided as an exhibit in the appellate record contains a signature that appears to be from Vasquez, but contains no file stamp indicating that it was filed with the court. Further, the trial court in ruling on Vasquez's motion to dismiss noted that 'there was [no] mention during court hearings of a written waiver signed by Mr. Vasquez. . . . The court gives no weight to the possible existence of a written speedy trial waiver.'"); *id.* at 46 ("On September 13, 2007 Deputy Public Defender Omar Hazel appeared as Vasquez's new counsel. ***He represented Vasquez for the next four-and-a-half years. During that period Hazel appeared on Vasquez's behalf 23 times, and all but one time waived Vasquez's appearance.***" (Emphasis added)); *DeCasas*, 54 Cal. App. 5th at 807 ("Similarly [to *Vasquez*] here, after his appearance shortly after the petition was filed in 2006, DeCasas did not appear in court or by video until September 2011, and not again until the probable cause hearing in August 2013. He thereafter appeared only sporadically and, when he did appear, ***neither the court nor his counsel inquired of him whether he was insisting upon a speedy trial or agreed to waive that right***." (Emphasis added)); *id.* at 792 ("At a hearing held in October 2010 . . . [t]he court asked Santiago if DeCasas was willing to waive time, and Santiago answered, 'Yes.' When Santiago was asked about this answer at the hearing on the motion to dismiss, ***Santiago testified that he "was waiving time on [DeCasas's] behalf ... [without] his permission***." (First alteration added, others in original; emphasis added)); *Ballardo*, 2022 WL 906421, at *6 ("[B]ecause appellant's counsel was the one seeking or agreeing to almost all the continuances, it would have been unlikely that he would contend such continuances were violations of appellant's right to due process. Under these circumstances, as well as

COMPLAINT                                      35                                      CASE NO. 25-2721

c.  agreeing to repeated continuances sought by the prosecution; [18]

d.  failing to obtain consent from SVP client/detainees to continue hearing dates, trial dates, and other deadlines which were in their control;[19]

e.  failing to meet reasonable deadlines in SVP cases;[20]

---

the fact that nothing in the record demonstrates appellant ever made a knowing and intelligent waiver of his right to a timely trial, we decline to find forfeiture [of his right to a timely trial]; *see also supra* note 24.

[18] *See, e.g., Vasquez*, 27 Cal. App. 5th at 46 ("During 2008 and 2009 there were eight continuances, either by stipulation of counsel or at the request of Vasquez's counsel."); *Ballardo*, 2022 WL 906421, at *1 ("From March 24, 2005, to November 12, 2008, the pretrial hearing was continued 19 times. All but one of those continuances were at the request of [appointed] counsel or pursuant to an agreement between both counsel. With the exception of June 7, 2006, when appellant's counsel stated he needed a continuance 'for further preparation,' the record discloses no reasons for the continuances." (Footnotes omitted)); *id.* at *7 ("The record discloses that *all but seven of the more than 60 continuances in this case resulted from either a request from appellant's counsel, or a joint request from both counsel*." (Emphasis added)).

[19] *See, e.g.*, *DeCasas*, 54 Cal. App. 5th at 791 ("Santiago directed his paralegals to meet with DeCasas to have him sign waivers of his right to appear and to a speedy trial, but DeCasas never signed one. *Santiago did not know whether anyone had advised DeCasas of his speedy trial rights and our record does not disclose why DeCasas did not sign a waiver*. At the next conference, . . . the court asked Santiago if he had obtained 'a declaration of time waiver [and] nonappearance' from DeCasas. Santiago said, '[A]ny sort of waivers information that I had for [DeCasas] have expired.' . . . .' The court continued the hearing . . . and told Santiago to 'get the declaration then.' Santiago said he would 'make attempts to do so.' At the April 29 conference, Santiago explained that he was still having 'difficulty getting [DeCasas] to cooperate' and he was 'still working on' getting a time and appearance waiver." (Alterations in original; emphasis added)); *id.* at 793 ("On September 12, 2011, DeCasas appeared by video. After setting the post-*Ronje* probable cause hearing for dates in June 2012, court and counsel agreed on December 7, 2011, for a status conference. The court asked DeCasas if he would like to be present by video on that date. DeCasas said he would. *No one asked DeCasas whether he was asserting or willing to waive his due process right to a speedy trial.*" (Emphasis added)).

[20] *See, e.g., Vasquez*, 27 Cal. App. 5th at 45 (17-month delay between filing of petition and probable cause hearing); *DeCasas*, 54 Cal. App. 5th at 790 ("In late 2007 [approximately one year after the petition was filed], Deputy Public Defender David Santiago began representing DeCasas. According to Santiago, 'not a lot had been done' on the case prior to the assignment to him. Santiago first appeared for DeCasas at a pretrial conference on December 11, 2007. The court continued the conference to April 8, 2008. On that date, the court continued the conference to June 26 pursuant to the stipulation of counsel." (footnote omitted)); *DeCasas*, 54 Cal. App. 5th at 792 ("After *Ronje*, the SVP unit of the Los Angeles County Public Defender's Office 'filed a significant number' of '*Ronje* motions,' which resulted in

COMPLAINT                              36                              CASE NO. 25-2721

     f.   allowing SVP cases to sit idle for years without meaningful progress;[21]

     g.  allowing experts' reports to lapse or otherwise go stale;[22]

     h.  failing to timely secure experts, to ensure that such experts are properly prepared, and to ensure that such experts complete their work in a timely fashion;[23]

---

a backlog of probable cause hearings in the superior court resulting in delays of one or two years.").

[21] *See, e.g., Vasquez*, 27 Cal. App. 5th at 45 ("Vasquez appeared at the first 16 court appearances, including at the probable cause hearing held on February 13, 2002. However, ***during the ensuing five-and-a-half years***, [Vasquez's public defender] appeared on behalf of Vasquez 35 additional times, each time waiving Vasquez's appearance in court. As the trial court concluded, '***[d]uring this time, it appears that little progress, if any, was made towards moving the case to trial***.'" (Emphasis added)); *see also DeCasas*, 54 Cal. App. 5th at 791 ("At the June 26, [2008] conference, ***Santiago stated that he had cases that were older than DeCasas's case and he did not 'anticipate being ready to go to trial on this matter in 2008 [two years after the petition against Decasas was filed],'but 'hope[d] to proceed on it sometime in 2009.*** The conference was continued to October 28, 2007, and on that date, to February 23, 2009. At the February conference, the prosecutor told the court that '[w]e're early in the hunt on this case' and "things [are] moving along.' Pursuant to counsel's stipulation, the court continued the conference to July 27, 2009." (Emphasis added; original alterations removed)); *id.* at 797 ("In late 2016, [Decasas's public defender] Santiago was assigned to represent George Vasquez . . . which was set for trial in January 2017. During his only court appearance in that proceeding, Santiago informed the court that he could not be prepared in time for the trial. ***Santiago also informed his 'head deputy' in an e-mail that he was concerned about his ability to competently represent Vasquez and that the case was affecting his ability to assist DeCasas.*** The head deputy then relieved him of work on the *Vasquez* case, but immediately assigned to him another, 'very complex' SVPA case.'" (Emphasis added)); *DeCasas*, 54 Cal. App. 5th at 798 ("Behle testified that she met with DeCasas once during the year she represented him and saw him by video several times. DeCasas had complained to her that his prior attorneys had not done work on his case while it dragged on for years.")).

[22] *See, e.g., Vasquez*, 27 Cal. App. 5th at 51 ("[O]n December 15, 2016 [16 years after the petition against Mr. Vasquez was filed] Deputy Public Defender Ellen Coleman appeared on Vasquez's behalf, replacing Santiago. She stated she was not prepared to go to trial on January 23, 2017 and that updated evaluations were required because Dr. Korpi's evaluation would be stale on January 3 and the other evaluation was seven months old.").

[23] *See, e.g.*, *Vasquez*, 27 Cal. App. 5th at 49 ("At a hearing on October 27, 2014 [14 years after the petition was filed against Vasquez] counsel discussed the status of the expert evaluations. … 'Your Honor, I haven't had an opportunity to have a conference with the defense expert. I know he has worked on the case.... And as the court knows, my department staff has been reduced by 50 [percent] and the workload has increased, and I have explained that to Mr. Vasquez, who

COMPLAINT               37             CASE NO. 25-2721

i. failing to declare unavailability, such that long-delayed SVP cases could be assigned to outside/independent counsel;[24]

j. ignoring requests from SVP clients/detainees to bring their case to trial promptly;[25]

k. failing to declare such conflicts, to permit their SVP detainees to file *Litmon-Vasquez* motions after the extensive delays in the processing of their cases, and to avoid conflicted representation;[26]

---

understands.'"); *DeCasas*, 54 Cal. App. 5th at 797 ("At a conference held in DeCasas's case on November 24, 2014 [about eight years after the petition was filed], Santiago stated: '[M]y caseload has had a significant change since the last time we appeared in court. I'm trying to make do with what I can, trying to triage what I can do based on my office's lack of resources.' Santiago further reported that he was still waiting for a defense report. The court continued the conference to January 21, 2015." (First alteration added, others in original).

[24] *See, e.g., Vasquez*, 27 Cal. App. 5th at 45-46 & n.6 ("From January 27, 2004 through the end of 2006 the pretrial hearing was continued 20 times; 13 of these were at the request of Vasquez's counsel; the remainder were by stipulation of counsel or order of the court. At the February 14, 2007 pretrial hearing [Vasquez's public defender] announced that the public defender's office was 'unavailable' for trial . . . [The trial court found that Vasquez's public defender] 'had an obligation to raise his concern with his supervisor and, if no relief was provided, to file a motion with the trial court to withdraw from the case, so that the trial court could appoint private counsel at public expense to provide adequate representation."); *see also id.* at 53 ("[Deputy public defender] Santiago testified he represented Vasquez at the November 17, 2016 hearing and continued to represent him for only seven or eight days. He told Vasquez that he would need more time to prepare before setting a new trial date; Vasquez responded that he wanted to proceed to trial in January 2017. Santiago had two or three boxes of files to review and could not be ready by the January 2017 trial date. ***Santiago raised his concerns with his head deputy, including that Vasquez would either need to give up his right to a speedy trial or have a lawyer who was not sufficiently prepared. The same day the case was reassigned*** [no conflict was declared]." (emphasis added)); *id.* at 810 ("In addition to transcripts of court proceedings in DeCasas's case, 'Santiago was present at various conversations with superior court judges and the public defender's office where the office informed the court of the problems with the caseloads and staffing." (alterations omitted)).

[25] *See, e.g., Vasquez*, 27 Cal. App. 5th at 53 (quoted *supra* note 24); *DeCasas*, 54 Cal. App. 5th at 798 ("According to Behle [assigned to represent DeCasas in 2017], Santiago had not given her any indication that DeCasas 'wanted his trial immediately.' In her review of the file, however, she found '[p]aralegal notes' indicating that, '[f]rom 2010 on,' DeCasas had told the paralegal, 'I want out of here. I want to go home.'" (First alteration added, others in original).

[26] *See, e.g., Vasquez*, 27 Cal. App. 5th at 45-46); *see also id.* at 49 (On December 8, 2014, in response to an inquiry from the Court, Mr. Vasquez's public defender

COMPLAINT                                      38                            CASE NO. 25-2721

        l.   failing to implement adequate training policies within the LAPD to prevent constitutional violations by their attorneys in their handling of their SVP caseloads;[27]

        m. transferring attorneys off of SVP cases, thereby requiring a new attorney to learn the case, further delaying representation;[28]

---

stated: "And I would just note that my office suffered a staff reduction of 50 percent of the lawyers. Then we suffered an additional reduction in the paralegals. And I have currently lost my paralegal and don't have a paralegal assigned on the case. So in addition to having my workload greatly increased, I also have cases in which I don't have assistance on, . . . . So because of this workload, we will have to see in January when we have the reports what the lay of the land is. . . . [The trial court responded]: "'Then we are going to have a trial. Okay? So let's get a date in about four months for trial. And if you can't get it done, then I am going to consider relieving your office. ... You have had this case for 14 years. I understand that your office made a decision to cut staff and to reassign cases. But 14 years is a very very long time. This case needs to move forward.' The case was set for trial on April 27, 2015."); *see also sources cited supra* notes 21, 24.

[27] *See, e.g. DeCasas*, 54 Cal. App. 5th at 798 ("Santiago left the SVP unit in early 2017. Deputy Public Defender Christina Behle took over DeCasas's case in March 2017 [ten years after the petition was filed]. ***Behle was new to the SVP unit at that time and had received no training in SVP litigation***.").

[28] *See, e.g., Vasquez*, 27 Cal. App. 5th at 50 ("On September 27, 2016, Vasquez's public defender informed the court 'that my office is trying to transfer me, and I'm fighting that transfer because it would be very disruptive to my clients in the cases and things that have been set.... *[A]nd my clients are not happy with the fact that yet again another lawyer is being transferred out. And that results in the cases having to start anew.*' … At the next hearing . . . Deputy Public Defender David Santiago appeared on Vasquez's behalf. . . . He informed the court he would not be ready for trial on January 23, 2017 and asked for the date to be vacated. The court asked Vasquez if he was willing to postpone the trial for his new attorney to prepare for trial. ***Vasquez stated***, '***Your Honor, I am not willing to waive my right to have a trial in a timely manner, nor am I willing to waive my right to have prepared counsel. These constant changes of counsels have denied me both. Enough is enough***. . . . .' The trial court responded by proposing to set the matter for a hearing to consider replacing the public defender's office with a bar panel attorney who could move the case forward more quickly. Vasquez agreed. However, Santiago only represented Vasquez for approximately seven or eight days." (Emphases added)); *id.* at 53 ("According to [deputy public defender] Shenkman, when she learned on September 27, 2016 that she was going to be transferred out of the SVP unit, ***she sent an e-mail to her head deputy***, ***describing 'how disruptive it would be to my clients in terms of trials that were set*** ... and that the office would be vulnerable to a *Litmon* motion.' Shenkman requested that the office rescind her transfer order. Shenkman stated she would have been ready for trial on January 23, 2017. She was eager to go to trial because she had the first negative evaluation from Dr. Korpi, . . . .' Ultimately she was transferred out of the SVP unit." (Emphasis added)); *id.* at 72 ("Both Shenkman and Santiago ***raised a concern with the head deputy of the public defender's office***, consistent with their responsibility under *In re Edward S.* (2009) 173 Cal.App.4th 387, . . . but to no avail." (Emphasis added)); *see also People v. Barrcena*, 2020 WL 4435548, at *2 (noting that "[a]t a status

COMPLAINT                39                CASE NO. 25-2721

n.  failing to advise clients of their rights and of changes in the law;[29]

o.  failing to communicate to SVP client/detainees the status of their cases, the strategies which were to be employed in defending their case, the likely duration of the delays, and the likelihood of success of their efforts;[30]

p.  failing to maintain adequate contact with clients, namely visiting less than once per year.[31]

157.  Deliberate indifference to the civil rights of SVP detainees such as Mr. Rubio is evidenced by said defendants ignoring the long delays in bringing SVP cases to trial and the long pre-PC and pre-trial detentions suffered by SVP clients, which were obvious and known consequences of the widespread practices, customs, policies, and procedures described herein.

158.  The foregoing acts, omissions, and systemic deficiencies are and were widespread customs, practices, policies and procedures of defendant County of Los Angeles, the Los Angeles County Board of Supervisors, and the LAPD, and by

hearing on July 11, 2012, deputy public defender Terry Shenkman made her first appearance on behalf of defendant," making Shenkman the third attorney defendant had in five years); *id.* at *4 ("In December 2016, defendant was assigned another deputy public defender, Sally Soher, after Ms. Shenkman was reassigned to a different unit."); *id.* ("On July 25, 2017, deputy public defender Christina Behle assumed representation of defendant. There is nothing in the record explaining why Ms. Behle substituted in for Ms. Soher."); *see also sources cited supra* note 27.

[29] *See, e.g. DeCasas*, 54 Cal. App. 5th at 791 ("Santiago did not know whether anyone had advised DeCasas of his speedy trial rights and our record does not disclose why DeCasas did not sign a waiver."); *see also supra* note 19.

[30] *See, e.g. DeCasas*, 54 Cal. App. 5th at 791 ("On July 27, 2009 [two and a half years after the petition against DeCasas was filed], Santiago told the court that he had not been in contact with DeCasas because DeCasas had been returned to prison for parole violations. Santiago anticipated DeCasas would be released in January 2010. The court continued the case to February 19, 2010. The court asked Santiago to bring to the conference a 'waiver of time' from DeCasas. Santiago said that doing so would 'be difficult.'").

[31] *See, e.g., DeCasas*, 54 Cal. App. 5th at 794 ("At some point after the [second] probable cause hearing [in 2013, approximately seven years after the petition against DeCases was filed], Santiago met with DeCasas in person for the first time.").

COMPLAINT                            40                            CASE NO. 25-2721

ratifying such, these defendants permitted and encouraged attorneys both in the LAPD to delay bringing SVP cases to trial in a timely fashion. This caused, permitted, and/or allowed under official sanction the attorneys of the LAPD to believe that the long delays in bringing SVP cases to PC and trial would not be objectively, thoroughly, and/or meaningfully investigated and that no negative consequences would befall them, all with the foreseeable result that the LAPD would greatly delay in bringing SVP cases to trial and thereby violate the civil rights of the SVP detainees in their charge, including Mr. Rubio.

159.   As a direct and proximate result of the acts and omissions alleged herein, Mr. Rubio endured 14 years of wrongful detention in violation of his due process rights, which caused him serious and permanent injuries and which has physically, psychologically, and emotionally impaired him permanently. A judicial finding of such a violation is not adequate to redress the suffering experienced by Mr. Rubio as a direct result.

## PRAYER FOR RELIEF

160.   Wherefore, plaintiff Anthony Rubio demands the following relief, against all the Defendants with respect to each of the claims for relief above:

a. Compensatory general and special damages in an amount in accordance with proof;

b. Punitive and exemplary damages, against Ronald L. Brown, Ruben Marquez, Justine Esack, and Ricardo Garcia, in their personal capacities, in an amount sufficient to deter and to make an example of these defendants;

c. Reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988;

d. Costs of suit necessarily incurred herein;

e. Such other and further relief as the Court deems just or proper.

COMPLAINT                          41                          CASE NO. 25-2721

**DEMAND FOR JURY TRIAL**

161.    Plaintiff Antonelli Rubio hereby demands a jury trial.

Respectfully submitted,

DATED:  October 15, 2025        LIVE OAK LAW OFFICE LLP

By:  */s/ Pilar R. Stillwater*

Pilar R. Stillwater
Robyn Fass Wang
Attorneys for Plaintiff
ANTONELLI RUBIO

COMPLAINT                          42                          CASE NO. 25-2721